IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | CIVIL ACTION |
| DEPARTMENT OF ENVIRONMENTAL | : | NO. 15-1232 |
| PROTECTION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| TRAINER CUSTOM CHEMICAL LLC, | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                              August 30, 2016


Plaintiff, the Commonwealth of Pennsylvania Department of Environmental Protection ("the Department"), brings this action against Defendants Trainer Custom Chemical, LLC ("TCC"), Jeremy Hunter, and James Halkias for violations of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and Pennsylvania's Hazardous Sites Cleanup Act ("HSCA") at the Stoney Creek Site, a facility owned by TCC. The Department has moved for summary judgment as to TCC's statutory liability, as well as Hunter and Halkias's individual liability under the alter ego theory. For the reasons

that follow, the Court will grant the motion in part and deny the motion in part.

## I.   FACTUAL BACKGROUND

A.   <u>The Site Prior to TCC's Purchase</u>

The Stoney Creek Site ("the Site"), located in Trainer, Pennsylvania, contains, or contained, a chemical manufacturing facility. Dep't Br. at 5, ECF No. 20-3. At one time, Stoney Creek Technologies, LLC ("Stoney Creek"), owned the Site, which contained – at least as of August 2007 – "approximately 17 million pounds of raw materials, chemical process intermediates, chemical products, off-specification material, reject material, waste material, other chemicals, [and] chemicals used to support on-Site activities." Hunter Answer Mot. Summ. J. Ex. 4 ¶ 3.7, ECF No. 21-2. That same year, according to the Department,[1] "there was a release or threatened release of hazardous substances at the Site . . . from the improper handling, storage and/or disposal of approximately 3 million pounds of flammable or combustible chemicals on the Site." Dep't Mot. Summ. J. ¶ 11, ECF No. 20.

As a result of this alleged release, the United States

---

[1]      Hunter admits this fact. Hunter Answer Mot. Summ. J. ¶ 11, ECF No. 21. Halkias, on the other hand, denies it, stating that he is "without sufficient information to ascertain the truth of the matter asserted because TCC was not in possession or control of the Site prior to October of 2012." Halkias Answer Mot. Summ. J. ¶ 11, ECF No. 23.

Environmental Protection Agency ("EPA") initiated removal response actions in 2007, pursuant to CERCLA. Id. ¶ 14.[2] At some point during the removal process, the Department and the EPA learned that, due to financial difficulties, Stoney Creek had been failing to pay its electric bills, and that the electric company therefore intended to shut off the facility's electricity. Id. But, says the Government, various pollution control features at the facility depended upon electricity, and the lack of electricity could have resulted in fire or additional chemical release. Id. ¶¶ 12-13.[3] Accordingly, in order to ensure that removal actions could continue, the Department began to pay the facility's electric bills. Id. ¶ 15. The Department claims to have spent $818,730.50 on electricity for

---

[2]     Though Halkias denies knowledge as to any releases that occurred before TCC took ownership of the Site, he does admit that the EPA initiated removal actions in 2007 and that the Department cooperated in that effort. Halkias Answer Mot. Summ. J. ¶ 14.

[3]     Again, Hunter admits these facts, Hunter Answer Mot. Summ. J. ¶¶ 12-13, but Halkias denies them on the basis that he is without sufficient information. Halkias Answer Mot. Summ. J. ¶ 12. Halkias further contends that the pollution control systems named by the Government did not rely on electricity to function, and that PECO – the electric company – stated during the Stoney Creek bankruptcy process that "it would not shut off the emergency electric supply." Id. ¶ 14. Halkias does not point toward documentation supporting this claims (indeed, Halkias filed no exhibits at all).

the Site over a period of several years. Id. ¶ 16.[4]

B.   TCC and the Purchase of the Site

On October 5, 2012, Defendants Hunter and Halkias filed a Certificate of Organization with the Commonwealth of Pennsylvania, forming TCC, a limited liability company. Hunter and Halkias signed the Certificate as the only two organizers. Hunter Answer Mot. Summ. J. Ex. 2, ECF No. 21-2. They listed Halkias's home address as TCC's registered office. Dep't Mot. Summ. J. Ex. 1, ECF No. 20-1.

In two transactions in October and November 2012, TCC purchased the Site for what appears to be a total of $20,600. Hunter Answer Mot. Summ. J. Ex. 1 at 3, 9,[5] ECF No. 21-2. The October purchase, which cost TCC $20,000, was paid for through a cashier's check drawn from Halkias's personal bank account. Dep't Mot. Summ. J. Ex. 4, ECF No. 20-1.[6]

At the time of the purchase of the Site – and, indeed, at the time Hunter and Halkias created TCC – Hunter, at least,

---

[4]     This figure represents the vast majority of the total sum – $932,580.12 – that the Department seeks to recover in this action. The additional amount comes from costs for contractors and personnel, as well as other miscellaneous response costs. Dep't Br. at 5.

[5]     Page numbers for all exhibits refer to the page numbers imposed by ECF.

[6]     It is unclear from the parties' submissions how TCC paid for the $600 November purchase.

was aware of the alleged contamination of the site: on September 12, 2012, after Hunter placed a bid for the Site, he signed an agreement with the Borough of Trainer stating, among other things, that the Site was facing "certain environmental issues which are being addressed by the Environmental Protection Agency and/or the Pennsylvania Department of Environmental Resources." Dep't Mot. Summ. J. Ex. 5, ECF No. 20-1.

C.   The Site After TCC's Purchase

On November 13, 2013, approximately a year after TCC purchased the Site, the Borough of Trainer issued a permit to "J Halkias/JK Myers" to raze "100 structures from site as per plan." Dep't Mot. Summ. J. Ex. 6, ECF No. 20-1. (JK Myers Contracting ("JK Myers") is the fictitious name for a business entity that Halkias registered with the Pennsylvania Corporations Bureau in April 2012.[7] Dep't Mot. Summ. J. ¶ 21.) Thereafter, many or most of the structures on the Site were demolished. Hunter and Halkias disagree about who was responsible for the demolition: Hunter claims that Halkias did it without Hunter's knowledge, Hunter Answer Mot. Summ. J. ¶ 22, and Halkias claims that any demolition was done by Hunter, Halkias Answer Mot. Summ. J. ¶ 22. At any rate, it is undisputed

---

[7]      Halkias says that Hunter knew Halkias registered the name. Halkias Answer Mot. Summ. J. ¶ 21. Hunter says he did not know that Halkias registered the name. Hunter Mot. Summ. J. ¶ 21.

that metals reclaimed from the Site during and/or after the demolition were sold for at least $875,321.42, paid to JK Myers (rather than to TCC). Dep't Mot. Summ. J. ¶ 23.

In 2013 and 2014, Department inspectors visited the Site, where they found that piping, tanks, and buildings were being rapidly demolished. Storage tanks had been cut open, and unknown materials were spilling out of the tanks and onto the ground.[8] Id. ¶ 24; Dep't Mot. Summ J. Ex. 8, ECF No. 20-2.

Meanwhile, Halkias and Hunter's relationship was disintegrating. According to Hunter, at least, he learned in 2013 that Halkias had begun demolishing structures on the Site. As a result, he says, he "seized the plant and locked it to keep out Halkias' scrappers." Hunter Br. at 6, ECF No. 21-1. But in August 2013, Halkias "unilaterally transferred title to the Site" to JK Myers. Id. Then, in November 2013, Hunter filed suit against Halkias in the Delaware County Court of Common Pleas. Hunter Answer Mot. Summ. J. Ex. 12, ECF No. 21-3. After a hearing, the court entered a temporary restraining order that enjoined Halkias and JK Myers from conducting any activities on the Site. The order also cancelled the deeds that purported to transfer title of the Site to JK Myers, and authorized Hunter to

---

[8]        Halkias and Hunter blame each other for the situation resulting from the rapid demolition. Halkias Answer Mot. Summ. J. ¶ 24; Hunter Answer Mot. Summ J. ¶ 24.

6

manage the operations of TCC and the Site until further order of the court. Hunter Answer Mot. Summ. J. Ex. 14, ECF Nos. 21-4, 2-15.

Thereafter, Hunter authorized Halkias to enter the Site to clean up debris. Hunter Br. at 6. However, according to Hunter, Halkias ignored the limits Hunter gave him and performed "additional scrapping," so Hunter revoked Halkias's authority to enter the Site. Id.

In mid-2014, in response to an Administrative Order, Hunter says he covered the Site's tanks with tarps and prepared a Work Plan for cleaning up the Site. Id. He also hired Westchester Environmental to perform an Asbestos Survey Report in June 2014. Id. The Report indicated that asbestos was present on the Site, so Hunter engaged NBC Environmental to clean it up. Id. at 6-7.

The current state of the Site is unclear from the parties' filings.

## II.  PROCEDURAL HISTORY

The Department filed the instant Complaint on March 11, 2015, naming TCC, Halkias, and Hunter as defendants. ECF No. 1. The Complaint contains six counts: (1) cost recovery against TCC under CERCLA; (2) cost recovery against TCC under HSCA; (3) cost recovery against Halkias under CERCLA; (4) cost recovery

against Halkias under HSCA; (5) cost recovery against Hunter
under CERCLA; and (6) cost recovery against Hunter under HSCA.
Defendants filed Answers.[9] ECF Nos. 7, 18.

On January 19, 2016, the Department filed the instant
motion for summary judgment. ECF No. 20. Hunter filed a timely
response in opposition on behalf of himself and TCC. ECF No. 21.
Halkias, however, missed the February 2 deadline for responding
to the motion. On February 5, he filed a motion for leave to
file his response nunc pro tunc, which the Court will grant.[10]

---

[9]     Both were filed late. As a result, the Department
requested an entry of default and moved to strike the late
Answers. ECF No. 8. The Court denied those requests. ECF No. 16.

[10]     The Department argues in its reply brief that the
Court should deny Halkias's request to file his response out of
time. In support of this argument, the Department contends that
the tardiness of Halkias's response prejudiced not only the
Department, but also Hunter, as Halkias had the opportunity to
read and reply to Hunter's allegations before filing his own
response. The Department also claims that Halkias's tardiness
limited the Department's own time to prepare and file its reply
brief.

     Though Halkias has demonstrated a troubling tendency
toward tardiness in this case – his Answer was filed late as
well – his delay of just a few days here does not warrant the
refusal to consider his response to the motion for summary
judgment, as "courts should reach the merits of a motion despite
untimely filing whenever doing so will not result in prejudice
to the other party." Fekade v. Lincoln Univ., 167 F. Supp. 2d
731, 738 (E.D. Pa. 2001).

     Here, the only prejudice the Department has identified
on its own behalf is that Halkias's late response limited the
Department's time to file a reply brief. This alleged prejudice
is insufficient to justify the harsh sanction requested. For one
thing, the Court did not set a specific deadline for the
Department's requested reply brief; logic would dictate that the

ECF No. 22. The same day, he also filed a portion of his response on behalf of himself and TCC, ECF No. 23; he did not file his memorandum until February 9, ECF No. 24. The Department, on February 12, filed a motion for leave to file a reply brief, which the Court will grant. ECF No. 25.

The motion for summary judgment is now ripe for disposition.

### III. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could

---

Department's time for filing a motion for leave to file a reply brief would begin when Halkias filed his response, not when Halkias's deadline passed. Accordingly, it is not clear that the Department actually did lose any time due to Halkias's delay of a few days. But even if the Department had lost time in that way, it could have petitioned the Court for an extension of time as a result of Halkias's delay.

return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)) (internal quotation marks omitted).

**IV.  DISCUSSION**

A.  <u>Chemtura</u>

As an initial matter, Hunter and Halkias both argue that the Department's failure to join Chemtura Corporation ("Chemtura") as a defendant presents a question of material fact that should defeat summary judgment as to all claims. Chemtura, it seems, is a chemical manufacturer that provided at least some portion of the chemicals and materials that were on the Site during Stoney Creek's tenure as owners. Hunter Br. at 11. The EPA entered into a settlement agreement with Chemtura concerning

the Stoney Creek Site, as well as many other sites. Hunter
Answer Mot. Summ. J. Ex. 5, ECF No. 21-2.

Defendants' argument is confusing, not least because
they provide no reasoning for it. Rather, they simply assert –
without legal support of any kind – that Chemtura was "liable
for any resulting response costs" from the chemicals it
provided, Hunter Br. at 11, and that there is a question of fact
why the Department did not name Chemtura as a defendant in this
case, id. Specifically, Hunter argues that "the Department has
not pleaded the reason for the nonjoinder [of Chemtura] pursuant
to F.R.C.P. Rule 19(b)." Id. at 12.[11]

Rule 19 governs the mandatory joinder of parties:

> A person who is subject to service of process and
> whose joinder will not deprive the court of subject-
> matter jurisdiction must be joined as a party if:
>
> > (A) in that person's absence, the court cannot
> > accord complete relief among existing parties; or
>
> > (B) that person claims an interest relating to
> > the subject of the action and is so situated that
> > disposing of the action in the person's absence
> > may:
> >
> > > (i) as a practical matter impair or impede
> > > the person's ability to protect the
> > > interest; or
> >
> > > (ii) leave an existing party subject to a
> > > substantial risk of incurring double,
> > > multiple, or otherwise inconsistent

---

[11]   Halkias joined these arguments without adding more. Halkias
Br. at 6, ECF No. 24.

obligations because of the interest.
Fed. R. Civ. P. 19(a). The Rule then goes on to explain that "[i]f a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). Joinder may not be feasible if, for example, joinder would deprive the court of subject matter jurisdiction. If joinder is required under Rule 19(a) but not feasible, Rule 19(b) instructs courts to consider several factors in determining whether to dismiss the case, including "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties." Fed. R. Civ. P. 19(b)(1). Obviously, Rule 19(b) is contingent upon Rule 19(a) – that is, only if joinder is mandatory under Rule 19(a) does a court proceed to determine whether to dismiss the case under Rule 19(b).

It is unclear how the joinder issue raised by Defendants presents any question of material fact; rather, it is a question of law that could, and perhaps should, have been raised in a motion to dismiss.[12] At any rate, Defendants have not

---

[12]     Indeed, a review of Rule 19 case law makes clear that Rule 19 issues are ordinarily raised and considered at the motion to dismiss stage – which makes sense, as Rule 19(b) specifically contemplates dismissal of the case. See, e.g., Gen. Refractories Co. v. First State Ins. Co., 500 F.3d 306 (3d Cir. 2007); Shetter v. Amerada Hess Corp., 14 F.3d 934 (3d Cir.

presented any reasons why joinder of Chemtura was required under Rule 19(a), such that the Court need now decide whether to dismiss the case under Rule 19(b). Specifically, Defendants have not explained why "the court cannot accord complete relief among existing parties," or why disposing of the action without Chemtura may "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1). Defendants have only (1) made the conclusory, unsupported statement that Chemtura is liable for response costs at the Site and (2) noted that the Department did enter into settlement agreements with Chemtura regarding two other sites. Even if the Court assumes that both of those claims are true, Defendants have still failed to show how they lead to the conclusion that Chemtura is a necessary party in this case under Rule 19(a).[13]

---

1994); <u>Sindia Expedition, Inc. v. Wrecked and Abandoned Vessel, Known as The Sindia</u>, 895 F.2d 116 (3d Cir. 1990).

       Defendants did not file motions to dismiss in this case. Halkias did include in his list of defenses that "Plaintiff failed to join or even name a necessary party," which may have been a reference to Chemtura – though Halkias does not name Chemtura either, so it is unclear. Halkias Answer at 9, ECF No. 7. And Hunter said something similar: "DEP has failed to join or even name a necessary party." Hunter Answer at 7, ECF No. 18.

[13]       Defendants do not mention Rule 19(a). In fact, Defendants cite no law of any kind in support of this argument, to which the two Defendants together devote less than two pages. <u>See</u> Hunter Br. at 11-12; Halkias Br. at 6.

Accordingly, the fact that the Department did not join Chemtura in this case does not provide a basis for denying the Department's motion for summary judgment. Thus, the Court will move on to consider the substance of the Department's motion.

B.    CERCLA

The Department asserts a claim against TCC for violations of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675 (2006).[14]

1.    Liability

CERCLA grants the President of the United States broad

---

[14]    In its motion for summary judgment, the Department also asserts both CERCLA and HSCA claims against Hunter and Halkias as individuals. However, it is clear from the Complaint, as well as from several statements in the Department's briefing, that the Department's individual claims against Hunter and Halkias rest on a theory of piercing the corporate veil. See, e.g., Compl. ¶¶ 51-62; Dep't Br. at 20 ("In addition to finding TCC liable, this Court should pierce the corporate veil and find Hunter and Halkias liable as individual owners and operators of the Site."); Dep't Br. at 13 ("Thus, in addition to asking this Court to find TCC liable as a responsible owner, the Department's second theory of liability is that this Court should pierce the veil of TCC and find Halkias and Hunter to be responsible parties and liable as individuals for the Department's response costs."). That is, the initial question is whether TCC is liable for violations of CERCLA and HSCA – and then, if so, whether to pierce TCC's corporate veil and hold Hunter and Halkias personally liable for what TCC owes as a result.

Accordingly, the Court will proceed to determine TCC's liability for the alleged statutory violations, and then turn to the question of piercing the corporate veil.

power to direct cleanup efforts of hazardous waste sites. The statute provides for a "Hazardous Substance Superfund," which the government may use to finance cleanup efforts so long as certain statutory provisions are met. 42 U.S.C. § 9611. CERCLA authorizes the President to respond to releases or threatened releases of hazardous substances by:

> (1) removing or arranging for the removal of hazardous substances; (2) providing for remedial action relating to such hazardous substances; and (3) taking any other response measure consistent with the National Contingency Plan that the President deems necessary to protect the public health or welfare or the environment. 42 U.S.C. § 9604(a). The President has delegated most of his authority under CERCLA to EPA.

United States v. Alcan Aluminum Corp., 964 F.2d 252, 258 (3d Cir. 1992). After a government agency uses the Superfund to cover cleanup costs, it may recover costs and damages from those responsible. 42 U.S.C. § 9607. In order for a plaintiff to recover under CERCLA, the plaintiff must establish that:

> (1)  the defendant falls within one of the four categories of "responsible parties";
>
> (2)  the hazardous substances are disposed at a "facility";
>
> (3)  there is a "release" or threatened release of hazardous substances from the facility into the environment;
>
> (4)  the release causes the incurrence of "response costs."

Alcan Aluminum, 964 F.2d at 258-59 (quoting 42 U.S.C. § 9607). Notably, "CERCLA imposes strict liability on responsible parties." Id. at 259 (citing 42 U.S.C. § 9601(32)).

15

Here, there is no question of material fact as to any of these elements. Indeed, Defendants do not dispute that TCC, as the owner and operator of the Site, is a responsible party under CERCLA; that the Site is a "facility" under CERCLA; or that response costs were incurred at the Site. Nor do Defendants argue that no release of hazardous substances occurred at the Site[15] – instead, Hunter and Halkias merely point fingers at each other, each arguing that the other was responsible for any release that occurred. This argument – while perhaps relevant to the question whether to pierce the corporate veil – is completely irrelevant to TCC's liability (which, again, is strict). Indeed, in alleging that the other was responsible for the release on the site, both Hunter and Halkias admit that a release, or releases, did occur. It does not matter who caused it. See Atl. Richfield Co. v. Blosenski, 847 F. Supp. 1261, 1277 (E.D. Pa. 1994) (noting that "[m]ere ownership is enough" to

_____

[15]      Halkias does deny that a release occurred before TCC took ownership of the Site, but only on the basis that he lacks knowledge of what occurred while Stoney Creek owned the Site. Halkias Answer Mot. Summ. J. ¶ 11. He offers no exhibits demonstrating that a release did not occur (indeed, he offers no exhibits at all), and a simple claim that he lacks knowledge is insufficient to establish a genuine dispute of material fact – especially because he does admit that the EPA and the Department initiated removal actions in 2007. Id. ¶ 14. He does not explain how he lacks knowledge of whether a release occurred before TCC owned the Site while simultaneously possessing the knowledge that government agencies – also before TCC owned the site – took action in response to a release.

establish CERCLA liability).[16]

However, an important question remains with respect to the first release that occurred on the Site – the release that occurred before TCC took ownership. It is true that a "current owner" of a Site is generally liable for costs incurred in response to a past release, even if the release occurred before the party took ownership. See Litgo N.J. Inc. v. Comm'r N.J. Dep't of Envtl. Prot., 725 F.3d 269, 381-82 (3d Cir. 2013). But does that liability extend to costs that were themselves incurred before the party took ownership?

Specifically, as a factual matter, Defendants contend that the removal efforts as to the first release ended before TCC took ownership. In contrast, the Department claims that the

---

[16]      Similarly, both Hunter and Halkias point to a CERCLA defense that provides that a person is not liable if they can establish by a preponderance of the evidence that the release of hazardous substances was caused solely by "an act or omission of a third party." 42 U.S.C. § 960(b)(3). Hunter argues that Halkias was such a third party; Halkias argues the same about Hunter.

          Again, Defendants incorrectly make this argument on behalf of their own individual liability. But the question is TCC's liability, and the relevant clause actually states that a person will not be liable where the release was caused solely by "an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant." Id. (emphasis added). The defendant at issue is TCC, not Halkias or Hunter. Halkias and Hunter's finger-pointing is utterly irrelevant when they both claim ownership in and/or control over the company that faces strict liability here.

EPA did not conclude its response until December 2012 – but the Department offers no evidence in support of this claim. Dep't Mot. Summ. J. ¶ 4. Moreover, the Department seems to believe that TCC is liable for any response costs incurred on the Site, no matter when they occurred. For example, the vast majority of the Department's alleged costs are electric bills – but the Department does not claim that they paid any electric bills after June 2009, which was more than three years before TCC purchased the Site. In fact, it is not clear that the Department incurred any costs resulting from Stoney Creek's release after TCC purchased the Site.

The question, then, is whether TCC is liable for the electric bills and other costs incurred before TCC took ownership of the site. Or, more generally, what is the temporal definition of an "owner" under CERCLA? Is a party an "owner" for the purposes of CERCLA liability even if it did not own the facility, or have any other connection to the hazardous release, when cleanup costs were incurred?

Neither the Department nor Defendants cite any cases addressing this question. And the Court has found no relevant cases in either the Third Circuit or the Eastern District of

Pennsylvania.[17]

The Ninth Circuit, however, has addressed this issue.
In <u>California Department of Toxic Substances Control v.
Hearthside Residential Corp.</u>, 613 F.3d 910 (9th Cir. 2010), that
court explicitly faced the question "whether 'owner and
operator' status under [CERCLA] is determined at the time that
cleanup costs are incurred or instead at the time that a
recovery lawsuit seeking reimbursement is filed." <u>Id.</u> at 911.
The court first noted that CERCLA is silent on "the proper date
from which to measure ownership." <u>Id.</u> at 913. Moreover, after
reviewing a number of cases from both the Ninth Circuit and
other federal circuits, the court determined that "[t]here is no
controlling or persuasive precedent that answers the precise
question" at issue. <u>Id.</u> Thus, the court turned to the statutory
context and legislative intent. First, the court concluded that
the "Congress's decision to activate the statute of limitations
at the time of cleanup is strong contextual evidence that
Congress intended the owner at the time of cleanup to be the
'current owner' in a subsequent recovery suit." <u>Id.</u> at 915.
Then, reviewing the purposes of CERCLA, the court reached "the
same conclusion – that current ownership is measured at the time

_____

[17]     Virtually all cases involving multiple owners concern
a cleanup process that began <u>after</u> the new owner purchased the
property. <u>See, e.g.</u>, <u>Litgo</u>, 725 F.3d at 373-76.

19

of cleanup." Id.

An analysis of CERCLA's purposes yields the same conclusion – that current ownership is measured at the time of cleanup. First, CERCLA encourages responsible parties to remediate hazardous facilities without delay. This policy weighs in favor of the [plaintiff's] position because a landowner that knows it will ultimately be responsible for the cleanup costs has no incentive to delay the completion of that process once it has begun. Conversely, under the view of liability urged by [the defendant], a landowner seeking to avoid liability by transferring the property before a lawsuit is filed has every incentive to delay completing the cleanup process until it has found a buyer; the recovery suit is likely to be filed once cleanup is complete and the total cost is known. Any contrived delay that an owner might employ to find a buyer before the recovery lawsuit is filed would contravene CERCLA's purpose of efficient cleanup, and this consideration favors the [plaintiff's] view that ownership is determined when cleanup costs are incurred and not when the recovery suit is filed.

Another important purpose of CERCLA is to encourage early settlement between potentially responsible parties and environmental regulators. The importance of settlement within the CERCLA scheme undercuts [the defendant's] argument for two reasons. First, measuring ownership from the date that the recovery lawsuit is filed requires that a recovery lawsuit be filed. A rule that produces a lawsuit in every case is the opposite outcome that CERCLA seeks to promote. Second, one of the most critical elements of a CERCLA settlement is the agreed remedial action plan that the responsible party agrees to undertake. Because the owner at the time of cleanup can help determine the scope of the cleanup and select from among the reasonably effective remedial alternatives, it follows that the same owner should be responsible for the cost of the remediation program that it had the opportunity to influence. CERCLA seeks to include property owners in the technical consulting process, and this policy is best served by a rule that sets current ownership at the time cleanup occurs.

Id. at 915-16 (footnote omitted) (citations omitted).

Accordingly, the Ninth Circuit held that "current ownership for purposes of liability under 42 U.S.C. § 9607(a)(1) is measured from the time the recovery action accrues," which is "at the point that recovery costs are incurred." Id. at 916. In other words, a new owner is not liable for recovery costs incurred before he took ownership of the facility.[18]

This approach makes sense, not least because – as the Hearthside court noted – under the opposite rule, "an owner could sell a recently cleaned piece of property to an innocent owner one day before the [CERCLA] statute of limitations runs, with the result that the new owner would bear full cleanup liability under CERCLA if a recovery action was later timely filed." Id. at 914-15. And though it is true that CERCLA is a broad statute with strict liability, see Alcan Aluminum, 964 F.2d at 258-59, strict liability does not mean limitless liability. It is difficult, as a matter of common sense, to imagine the government rightfully recovering from a party that neither caused a hazardous release nor owned the facility when the release was remedied.

Therefore, the Court will hold TCC liable for any response costs incurred after TCC took ownership of the Site,

---

[18]    Unless, of course, he is also liable for a reason other than his ownership of the facility. See 42 U.S.C. § 9607(a).

but not for costs incurred beforehand.

### 2.  Damages

Having established the scope of TCC's liability under CERCLA, the Court must now consider whether there is any genuine dispute of material fact as to the amount of damages – that is, response costs – TCC owes to the Department.

There is, quite evidently, such a dispute. Reviewing the Department's Cost Recovery Report – which helpfully divides the costs by date – the only costs that were incurred, at least in part, after TCC purchased the Site are: (1) personnel charges in the amount of $57,379.61; (2) payments to contractors in the amount of $56,368.00; and (3) charges for travel, in the amount of $23.00. Dep't Mot. Summ. J. Ex. 3, ECF No. 20-1. The personnel charges, however, cover the period from November 2006 to May 2015; TCC is not liable for that entire period. The Department has provided fairly detailed time sheets, with each personnel activity listed by date. Id. Theoretically, then, the Court could easily determine which personnel charges occurred after TCC's purchase of the site and calculate the total personnel charges for which TCC is liable – but, while the time sheets do indicate how many hours of labor the Department paid for each day, they do not indicate how much any individual hour of labor actually cost. Without that critical detail, the Court

cannot in fact calculate the relevant personnel charges.

And the Department has provided no supporting documentation for the payments to contractors or the travel charges (both of which TCC is fully liable for, as they occurred in 2014 and 2015, respectively – after TCC's purchase of the Site).

At trial, the Department will have the burden of proof as to all of these charges. Accordingly, it cannot now win judgment on the basis of documentation that is insufficient. Thus, a genuine dispute of material fact remains as to the amount of damages for which TCC is liable, and the Court will deny the Department's motion for summary judgment with respect to CERCLA damages.

C.   HSCA

The Department also asserts a claim against TCC for alleged violations of Pennsylvania's Hazardous Sites Cleanup Act ("HSCA"), 35 Pa. Const. Stat. §§ 6020.101-1305 (1988).

1.   Liability

HSCA "is Pennsylvania's version of CERCLA and was in fact modeled after the federal statute." Two Rivers Terminal, L.P. v. Chevron USA, Inc., 96 F. Supp. 2d 432, 443 (E.D. Pa. 2000). However, CERCLA and HSCA are not identical.

To state a claim for recovery under HSCA, a plaintiff

must establish that:

> (1)   defendants are responsible parties;
>
> (2)   there has been an actual or threatened "release" of a hazardous substance from a site;
>
> (3)   "response costs" were or will be incurred; and
>
> (4)   the response costs were "reasonable and necessary or appropriate."

In re Joshua Hill, Inc., 294 F.3d 482, 485 (3d Cir. 2002). Again, the relevant question here is the scope of TCC's liability.

As with CERCLA, a person who owns or operates the relevant site is a "responsible party" under HSCA. Unlike CERCLA, however, HSCA provides temporal definitions for ownership, stating that:

> [A] person shall be responsible for a release or threatened release of a hazardous substance from a site when any of the following apply:
>
> > (1)   The person owns or operates the site:
> >
> > > (i)   when a hazardous substance is placed or comes to be located in or on a site;
> > >
> > > (ii)  when a hazardous substance is located in or on the site, but before it is released; or
> > >
> > > (iii) during the time of the release or threatened release.

35 Pa. Cons. Stat. § 6020.701(a).

This language supports the same holding as above: TCC is liable only for costs incurred after it took ownership of the

24

Site. Hazardous substances were located on the Site before TCC purchased the Site, but TCC did not own or operate the Site then. Thus, TCC is not responsible for costs incurred before its purchase of the Site. However, once TCC owned the Site, it became immediately liable for any release or threatened release resulting from any hazardous substances located on the Site, as it then owned or operated the Site when hazardous substances were present there.

Accordingly, the Court finds TCC liable under HSCA for costs incurred after, but not before, TCC purchased the Site.

### 2.   Damages

Concerning damages under HSCA, the same analysis applies as to damages under CERCLA: the Department has failed to provide documentation that is sufficient to support the entry of a money judgment. Accordingly, the Court will deny the motion for summary judgment as to HSCA damages on the basis that a genuine dispute remains as to the response costs incurred after TCC purchased the Site.

### D.   Piercing the Corporate Veil

The Department also seeks to make Hunter and Halkias personally liable for repaying the Department's response costs. Thus, the Court must determine whether to pierce TCC's corporate veil.

25

As a general rule, members of a limited liability company[19] or shareholders of corporations are "not personally liable to perform corporate obligations." Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1520-21 (3d Cir. 1994). But in some rare instances, courts will disregard that rule by "piercing the corporate veil," which is "an equitable remedy whereby a court disregards 'the existence of a corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation.'" In re Blatstein, 192 F.3d 88, 100 (3d Cir. 1999) (quoting In re Schuster, 132 B.R. 604, 607 (Bankr. D. Minn. 1991)).

The parties agree that whether to pierce the corporate veil in this case is a matter of Pennsylvania and Third Circuit law. In Pennsylvania, there is a strong presumption against piercing the corporate veil, Lumax Indus., Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995); a court should do so only when "the corporation was an artifice and a sham to execute illegitimate

---

[19]    Though it is true that most applications of this doctrine involve corporations, the doctrine may also be applied to limited liability companies, like TCC. See 15 Pa. Cons. Stat. Ann. § 8904(b) Committee Comment ("It is expected . . . that in the appropriate case the doctrine of piercing the corporate veil will be applied to a limited liability company."); see also, e.g., In re LMcD, LLC, 405 B.R. 555, 560 (Bankr. M.D. Pa. 2009) ("[T]he Committee Comment to . . . § 8904(b) makes clear that the equitable remedy of 'piercing' is available regarding an LLC."); Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC, 846 A.2d 1264, 1281 n.11 (Pa. Super. Ct. 2004) (quoting the same committee comment).

purposes and [an] abuse of the corporate fiction and immunity that it carries." Kaplan, 19 F.3d at 1521 (alteration in original) (quoting Wheeling-Pittsburg Steel Corp. v. Intersteel, Inc., 758 F. Supp. 1054, 1058 (W.D. Pa. 1990)).

The doctrine of piercing the corporate veil encompasses several different theories. Here, the Department seeks to pierce the corporate veil through the "alter ego" theory, which "is applicable where the individual or corporate owner controls the corporation to be pierced and the controlling owner is to be held liable." Miners, Inc. v. Alpine Equip. Corp., 722 A.2d 691, 695 (Pa. Super. Ct. 1998) (emphasis omitted). It is appropriate to pierce the corporate veil through this theory only where "a corporation's affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the alter ego's use of its assets for his own benefit in fraud of its creditors. In short, the evidence must show that the corporation's owners abused the legal separation of a corporation from its owners and used the corporation for illegitimate purposes." Kaplan, 19 F.3d at 1521.

In determining whether to pierce the corporate veil, courts are instructed to consider, among other things,[20] whether:

---

[20]     Some factors, such as whether the company has failed to pay dividends, are not relevant where the company at issue is a limited liability company and not a corporation.

(1) the company is undercapitalized; (2) there has been a failure to observe corporate formalities; (3) the dominant shareholder has siphoned funds from the company; (4) other officers or directors are not functioning; (5) there is an absence of corporate records; and (6) "the corporation is merely a facade for the operations of the dominant stockholder or stockholders." Id. (quoting United States v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981)).

Here, in arguing that the Court should pierce TCC's corporate veil, the Department points to several of the above considerations.

First, the Department argues that "Halkias expressly created TCC as his own personal LLC with the sole purpose to own the Site and shield himself from liability." Dep't Br. at 14. In support of this claim, the Department points out that, according to TCC's Operating Agreement – which Halkias signed as the "[s]ole member" of TCC – the purpose of TCC "is to own the former Stoney Creek Technologies LLC site, improve it, clean it up, rent it out, to shield James P Halkias from personal liability, and to protect the LLC from any claims, accidents, or liability." Dep't Mot. Summ. J. Ex. 12, ECF No. 20-2. Moreover, TCC's address is Halkias's home address, and "[t]he company may be dissolved at any time, and the property transferred at cost to James P Halkias, his heirs or assigns." Id. The Department

28

also notes that the Operating Agreement provides that Halkias was to give TCC its first $25,000, id. – and, indeed, TCC's ledger states that the company's starting balance was $25,000.[21] Dep't Mot. Summ. J. Ex. 10, ECF No. 20-2. And the first entry on the ledger is the purchase of the Site for $20,000. Id. But, as discussed above, that $20,000 came directly out of Halkias's personal bank account – not out of a TCC account. Dep't Mot. Summ. J. Ex. 4, ECF No. 20-1.

Second, the Department contends that TCC is undercapitalized. According to TCC's ledgers, the starting balance was $25,000, the 2013 ending balance was $836, and the 2014 ending balance was $221.[22] The Department argues that these figures demonstrate gross undercapitalization – and, further, that Halkias deliberately kept TCC undercapitalized by funneling all profits from the Site's scrap metal to JK Myers instead of to TCC. Dep't Br. at 14.

Third, the Department argues that "TCC as an entity has done nothing in connection with this Site." Id. at 15. Specifically: (1) the September 17, 2012, Agreement addressing

---

[21]     Confusingly, the ledger is labeled as TCC's "2013 Ledger," listing the starting balance – and the purchase of TCC – on October 4, 2013. Dep't Mot. Summ. J. Ex. 10, ECF No. 20-2. But TCC was formed – and the Site purchased – in 2012.

[22]     The 2015 ending balance is unknown. The Department also states that the 2012 ending balance was $586, but they do not supply evidence of that figure. Dep't Br. at 14.

the purchase of the Site is between the Borough of Trainer and Jeremy Hunter, listing Hunter as the bidder; it does not mention TCC, Dep't Mot. Summ. J. Ex. 5, ECF No. 20-1; (2) the permit for the demolition was issued to "J Halkias/JK Myers," and the fee for the extension of the permit was paid with a check from "J K Myers," Dep't Mot. Summ. J. Ex. 6, ECF No. 20-2; (3) the profits from selling the Site's scrap metal went to JK Myers, Dep't Mot. Summ. J. Ex. 7, ECF No. 20-2; and (4) when a Pennsylvania state court ordered TCC to perform an asbestos survey, the survey was completed for "Hunter Property Services, LLC," not for TCC, Dep't Mot. Summ. J. Ex. 9, ECF No. 20-2. On this basis, the Department contends that "TCC is nothing but an empty shell of an LCC [sic] created solely to attempt to shield Halkias and Hunter from personal liability." Dep't Br. at 15.

Finally, the Department contends that TCC has not complied with corporate formalities. In discovery, the Department apparently requested "all documents on which Trainer Custom Chemical, LLC will rely on [sic] to show that it observed corporate formalities and is adequately capitalized." Id. In response, Hunter and Halkias sent the Department TCC's certificate of organization, operating agreement, a one-page ledger, and a one-page certificate of membership agreement. Id. at 15-16. The Department argues that "[t]hese few documents fall far short of what is required to establish and prove the

existence of a legitimate corporation." Id. at 16.

These points are, at least in part, facially compelling. Specifically, the fact that Halkias and Hunter have, thus far, funneled all work on the Site past TCC into their other business entities – at least one of which then caused a release of hazardous substances – arguably suggests that TCC may be a mere artifice "to execute illegitimate purposes." Kaplan, 19 F.3d at 1521. It is especially curious that Halkias, as the "managing member" of TCC, entered into a contract with himself, as the "managing member" of JK Myers – he signed the contract for both parties – in which JK Myers would perform some work on the Site in exchange for salvage rights. Dep't Mot. Summ. J. Ex. 11, ECF No. 20-2. And it is possible, given the fact that the first entry on TCC's ledger is a payment that actually came straight out of Halkias's personal bank account, that there is or was some commingling of TCC's and Halkias's funds.[23]

But at this stage, the Court is required to view the facts in the light most favorable to Defendants – not determine what is merely possible. And, for the most part, the Department has failed to present evidence that is sufficient to overcome

---

[23]     For his own part, Halkias states that Hunter "commingled personal funds with those of TCC while on vacation in Cancun, Mexico." Hunter Br. at 6. Halkias provides no documentation or further explanation of this alleged commingling.

31

the strong presumption against piercing the corporate veil. It is true, for example, that TCC has very little money and may be undercapitalized. But "the record . . . is devoid of any evidence . . . as to the level of capital required" for TCC's purposes. Trustees of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 197 (3d Cir. 2003) ("For a small, closely-held corporation such as [the defendant], the [amount of] initial capitalization may well have been sufficient for that corporate undertaking under normal operating conditions."). Without such evidence, the Court cannot determine that there is no genuine dispute of material fact as to whether TCC was in fact undercapitalized. Similarly, the Department argues that TCC's paperwork does not prove the existence of a legitimate corporation – but TCC is a limited liability company, not a corporation. And, indeed, the requirements for LLCs are "less stringent" than the requirements for corporations. In re LMcD, LLC, 405 B.R. 555, 561 (Bankr. M.D. Pa. 2009). The Department does not explain which records TCC, as an LLC, was required to keep but did not, or which corporate formalities TCC was required to observe but did not. These gaps in the Department's argument keep the Department from satisfying its heavy burden in this context.

On the whole, thus, the Court will deny the Department's motion for summary judgment as to the issue of piercing the corporate veil.

**V.   CONCLUSION**

For the foregoing reasons, the Court will grant the motion for summary judgment in part, holding that TCC is liable under CERCLA and HSCA for any response costs incurred after TCC purchased the Site, but not for response costs incurred before TCC purchased the Site. The Court will deny the motion for summary judgment as to damages and as to Halkias and Hunter's individual liability.